UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JENNIFER GREEN,

                             Plaintiff,

               -against-

SIA PARTNERS U.S., INC., SIA PARTNERS,
and DANIEL CONNOR,

                         Defendants.
-------------------------------------------------------------------X

**COMPLAINT**

Case No. 21-cv-5626

     Plaintiff JENNIFER GREEN ("Ms. Green"), by and through her attorneys, LEVY RATNER, P.C., alleges as follows upon information and belief against Defendants SIA PARTNERS U.S., INC. ("Sia"), SIA PARTNERS, and DANIEL CONNOR ("Mr. Connor") (collectively, "Defendants"):

## NATURE OF ACTION

     1.     This is an action to remedy discrimination in employment because of sex and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") as amended, 42 U.S.C. §§ 2000e, *et seq*.; the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621, *et seq*.; the Equal Pay Act of 1963 ("EPA") as amended, 29 U.S.C. § 206(d); the New York State Human Rights Law ("NYSHRL"), New York Executive Law §§290, 296 and 296(6); New York Labor Law § 194; and the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code §§8-101, *et seq*.  This action seeks declaratory and injunctive relief, back pay, front pay, and compensatory and punitive damages both to secure future protection and to redress deprivation of Ms. Green's rights under these federal, state, and local laws.

     2.     This lawsuit concerns a pattern of sex and age discrimination that Sia and Sia's

Chief Executive Officer ("CEO") Mr. Connor, directed at Ms. Green.  Ms. Green began her career with Sia at a salary and title lower than her younger, male peers with similar experience and credentials, and her salary progression and promotional opportunities have been blocked.  She has been repeatedly verbally harassed by Mr. Connor, retaliated against for reporting harassment of herself and other Sia employees, and demeaned by Mr. Connor to other Sia employees, with resulting damage to her reputation and earnings potential.

## JURISDICTION AND VENUE

3.      The jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3), 29 U.S.C. §216(b), 28 U.S.C. §§1331 and 1343(a)(3)-(4), and 28 U.S.C §1367(a) for claims arising under the NYSHRL, New York Labor Law and NYCHRL, based on supplemental jurisdiction over claims that arise from a common nucleus of operative facts and are so intertwined with other matters pending before the Court as to make exercise of supplemental jurisdiction appropriate. Jurisdiction is further invoked pursuant to 28 U.S.C. §§2201 and 2202, as Plaintiff is seeking a declaratory judgment concerning Defendants' conduct in violation of law.

4.      Pursuant to 28 U.S.C. §1391(b), venue is proper in the United State District Court for the Southern District of New York because most of the events giving rise to the claims occurred within this District and Defendant Sia Partners U.S. is headquartered within the District.

5.      Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII. This action is founded on a charge of discrimination filed with the U.S. Equal Employment Opportunity Commission ("EEOC") (Charge No. 520-2021-02912). The lawsuit is commenced within ninety (90) days of Plaintiff's receipt of a notice of right to sue. A copy of the notice is annexed hereto as Exhibit "A."

### JURY DEMAND

6.      Plaintiff hereby demands a trial by jury on all issues properly triable thereby.

### PARTIES

7.      Jennifer Green is a woman over the age of 40 who resides in Queens, New York and is employed by Sia, under the authority of Mr. Connor.  Ms. Green has been discriminated against and unlawfully harassed because of her sex and age by Sia Partners and its U.S. CEO Daniel Connor, and she has suffered retaliation for opposing discrimination.

8.      Sia Partners is a global management consulting firm headquartered in Paris, France, with 31 offices across 18 countries. Sia Partners was founded in 1999 by Matthieu Courtecuisse ("Mr. Courtecuisse"), who is currently the global CEO and majority stakeholder.

9.      Sia Partners U.S. ("Sia") is a management consulting firm specializing in the financial services industry among other fields. Sia is the U.S. subsidiary of Sia Partners. Sia Partners' U.S. business operations began in 2012, with the acquisition of OTC Conseil Americas, Inc., the New York branch of OTC Conseil Group. Prior to Sia's U.S. acquisitions of Loft9, LLC in March 2019; Gartland & Mellina Group Corp ("GMG"), effective in August 2019; and Caiman Consulting, LLC, effective in December 2019, Sia had less than 100 employees, approximately 65-80 people in the New York office, and the remaining in Sia's Houston, TX, and Charlotte, NC offices. Sia now has offices in New York, NY; Denver, CO; Charlotte, NC; Seattle, WA; San Jose, CA; and Houston, TX, Baltimore, MD, and Chicago, IL, and employs roughly 350 people. Sia is also planning to open a new office in Los Angeles, CA. Sia is dominated by Mr. Connor, whose mercurial, abusive and retrograde views on gender, age and racial inclusivity have set the tone for the U.S. organization.

10.     Mr. Connor is the CEO of Sia and has authority over every employee hired directly

3

by Sia, including Ms. Green. Mr. Connor determined Ms. Green's disparate pay, discriminatorily denied her promotions, subjected her to harassment and hostile treatment, and retaliated against her for opposing discrimination and harassment.

## STATEMENT OF THE FACTS

### PAY AND TITLE DISPARITY UPON HIRE

11.     Ms. Green began her employment with Sia in November 2017. When she was initially interviewed by Sia, its then-Director of Human Resources Bibi Bhagwandin ("Ms. Bhagwandin"), asked Ms. Green to disclose her prior salary, which the New York City Human Rights Law now forbids because such a practice tends to deflate the earnings of women.

12.     Ms. Green's application for employment with Sia was not in response to a particular job posting, and she did not interview for a particular title.  She had a prior working relationship with Sia's recruiter, Jackie Jones (nee DeJohn), and contacted her directly to inquire about a position at Sia.  Ms. Green was initially brought in for an informational interview with two of Sia's employees, but Mr. Connor and Ms. Bhagwandin also spoke with her.  At the time of her interview, Ms. Green had 20 years of experience in finance, compliance and law, and she had both a law degree and a Master's Degree in Technical Writing.  Upon hire, however, she was assigned the title of Consultant, which is the entry-level title at Sia.  Ms. Green was given only one day to review and sign the offer letter that was provided to her, because Sia had set up an interview for her with a client at HSBC the next day. However, her start date was contingent on her starting at a project with a client, which is not the standard practice at Sia.  Most new hires come to the main office in their area and are "on the bench" until they are staffed on a client project.

13.     By asking Ms. Green about prior pay and not providing her an adequate amount of time to negotiate a higher role and pay, Sia knowingly disadvantaged Ms. Green at the onset of

her career at Sia. Sia has had ample opportunity to rectify the title and pay discrepancy as compared to males, and at the direction of Mr. Connor, has chosen not to do so.

14.     At the start of Ms. Green's employment with Sia, she was staffed to a project with HSBC and was billed to HSBC as a Senior Consultant based on her level of skill, her law degree, and having nearly 20 years of relevant industry experience.  Internally, however, she remained in the title of Consultant within Sia.

15.     Two employees from Sia were assigned to this project: Ms. Green and Joanna Giza ("Ms. Giza"), a woman under the age of 40.  Given its small size, monthly invoices from the finance department were given to Ms. Green and Ms. Giza to submit to HSBC.  This is when Ms. Green learned that she was being billed to the client as a Senior Consultant, similar to Ms. Giza who actually had the title of Senior Consultant at Sia.  For the duration of the project, Ms. Green was billed as a Senior Consultant, even though she was only paid by Sia as a Consultant.

16.     During the first quarter of 2018, Ms. Green spoke with HR about this discrepancy, believing that her title was wrong because it did not match the billing.  She was told that her title was correct, but when she asked about the discrepancy in billing, an explanation was not provided. The topic was quickly changed, and Ms. Green understood that this was not something to be discussed.

17.     During her tenure at HSBC (November 2017 – June 2018), neither the client nor anyone at Sia had issues with the quality of Ms. Green's work.

18.     The inferior treatment that Ms. Green experienced fits with a pattern of Sia avoiding the hiring of women over the age of 40. Since opening an office in New York in 2012, Sia has a history of bypassing women over 40 in favor of hiring men under the age of 35. In recent years,

the hiring of employees over 40 is still rare and the older workers who are hired are disproportionately men. Ms. Green was one of only two women over 40 hired in 2017 and 2018.

19.     As of December 31, 2017, Sia's total full-time employee headcount was approximately 70, with approximately five women (7% of Sia employees) over 40, including Ms. Green. Two or three of those women were brought to the company as a result of Sia's acquisitions between 2013-2016.  While Sia Partners has grown to ~300 full time employees, this expansion was primarily the result of acquisitions.  The number of women over 40 at the company is still under 10%, In the New York office, there are four women over 40 – the same four women that were in the New York office at the end of 2017. Mr. Connor, who approved new hires prior to the mergers, very rarely hired people over 35 years of age, with the majority of all new hires being in their 20s.

PASSED OVER FOR PROMOTION IN JUNE 2018

20.     Throughout Ms. Green's tenure at Sia Partners, her work has met the standards set by the client and Sia's project managers and partners. At no time was she ever told her work quality did not meet expectations.

21.     Sia generally awards promotions in June and December. For each review cycle, there is a meeting among the managers who discuss candidates for promotion.  The managers' list of employees recommended for promotion goes to the partner, who hold a meeting where the final promotions list is created.  Former associate partners, Daniel Ward and Christopher Pearson, have stated to Ms. Green that Mr. Connor has an inherent bias against women and that he is the final arbiter of promotions and compensation, despite the fact he is not the direct manager for most of Sia's women employees.

22.     In March 2018, Ms. Green spoke with Mr. Connor about promotion, in light of the fact that she was being billed to clients at the Senior Consultant higher level.  In their conversation, Mr. Connor led Ms. Green to believe that a promotion from Consultant to Senior Consultant was likely for her in June 2018.

23.     When the HSBC project concluded in June 2018, Ms. Green was "on the bench" for three weeks while she awaited a new client project.  During this time, Ms. Green learned that she was not being promoted in the June 2018 round of promotions.  She asked Mr. Connor about the decision, so as to ensure that she was meeting Sia's expectations and would be well-positioned for promotion in December 2018. Mr. Connor reacted to Ms. Green's inquiry with outrage, and this led to an intense ten-day period of harassment against her in July 2018, in which he summoned Ms. Green into his office early each morning, when the office suite was otherwise vacant, and berated and demeaned her. During these hostile encounters, Mr. Connor only launched personal attacks and insults at Ms. Green, telling her for example that all of the managers hated her, that Nicolas Becquet hated her, and that if people had liked her when past positions were being eliminated, they would have found a role for her.  He never raised any performance or other work-related concerns as the basis for summoning her into his office every morning. Mr. Connor would cease his harassment each morning only when another staff member arrived to work, which is evidence of his awareness that his conduct was improper. Upon information and belief, male employees who have sought promotion within Sia and discussed their promotion tracks with Mr. Connor have not been subjected to this hostility from Mr. Connor.

24.     Since June 2018, Mr. Connor, who was not Ms. Green's direct manager, has interfered with the year-end review process by instructing nearly all of her reviewers as to how she

should be graded.  Mr. Connor's interference, based on sex and age biases, and his harassment, disparate treatment, and retaliation have also led to delayed promotions and career advancement for Ms. Green, despite her having the support of her direct managers.  This has resulted in Ms. Green being compensated less when she ultimately was promoted.

MR. CONNOR'S INTERFERENCE WITH 2018 YEAR-END REVIEW

25.     Ms. Giza was asked by Human Resources to conduct Ms. Green's 2018 year-end review.  Ms. Giza and Ms. Green worked together for the first five months of 2018 at HSBC, but have not worked together since.  In or around December 2018, Ms. Giza told Ms. Green that despite her positive opinions of her and her work, she was told by Mr. Connor to give Ms. Green a C grade for 2018.

26.     Ms. Green's Sia project manager, Lekisha Nicholas ("Ms. Nicholas"), was not consulted or invited to participate in the year-end review process for 2018.  Ms. Nicholas had spoken with Mr. Connor at the Scotiabank office prior to the year-end review process to let him know that Ms. Green was a great team member and was excelling on the project.  In response, Mr. Connor had yelled at Ms. Nicholas (a black woman), in front of the project senior manager, Nicolas Becquet, telling her that she is new to the company and does not know enough to tell him anything. He also told her that he was suspicious of her intentions. Ms. Nicholas confided to other Sia employees in tears that Mr. Connor had attacked her for have praised Ms. Green's work. Ms. Green spoke to Human Resources to insist that Ms. Nicholas be added as a year-end reviewer, since she was Ms. Green's direct manager. Ms. Nicholas reviewed Ms. Green honestly and gave her high marks. Ms. Nicholas left Sia shortly thereafter.

27.     At no time in 2018 did Mr. Connor provide any instance of any problem with Ms.

Green's work performance.

LOWER PROMOTIONAL SALARY INCREASE FOR 2018

28.     Ms. Green was finally promoted to Senior Consultant in December 2018.  However, even with this promotion, she was still well below the Manager title that would befit her education and experience.  In addition, her promotional salary increase was less than the increase awarded to men who were promoted at the same time, into the same title, and who performed substantially equivalent work; for example, Stephen Perez ("Mr. Perez") (a man under the age of 40) who was also promoted to Senior Consultant in December 2018. Upon information and belief, Mr. Perez received a combined promotion and cost-of-living increase of $17,500 in December 2018, while Ms. Green received $7,000. From the date of their hires in 2017 to January 2019, Mr. Perez's overall salary increased by 22.8%, while Ms. Green's overall salary increased by 7.3%.

29.     Furthermore, even men under 40 who had a lower title and were not promoted in December 2018 received higher salary increases in 2018 than Ms. Green, including William Herzog (who received $10,000) and Peter Kuenne (who received $7,500).

30.     Of those hired in 2017 and promoted in December 2018, the salaries of the women increased by an average of 9.3%, and the salaries for men increased by an average of 18.4%. All of the women promoted but receiving lower salary increases are women of color or over the age of 40 and, on average, had more years of work experience (specifically in financial services), were the only group with advanced degrees and certifications/licenses, and generated more revenue than the men who received greater increases. The fact that male consultants under 40 (even those who were not promoted between January 2017 and January 2019) received higher average salary increases is strong evidence of sex-based discrimination.

9

RETALIATION CONCERNING WORKING GROUPS

31.     Mr. Connor's abusive treatment toward Ms. Green has extended into the area of "Working Groups," which are internal Sia committees, and it continues to cause harm to this day. Since starting her work for Sia, Ms. Green was active in Sia's Compliance Working Group as well as the Regulatory and Risk Working Group. She attended Working Group meetings and wrote articles, which Sia calls "IP."  Mr. Connor leads the Compliance Working Group.  In the beginning of 2019, as a result of Mr. Connor's abusive treatment of Ms. Green in 2018, she asked Ms. Bhagwandin for permission to leave Mr. Connor's Compliance Working Group and stay with the Regulatory and Risk Working Group. Ms. Bhagwandin, apparently in agreement that the environment was hostile, consented to this request and recorded it in a spreadsheet. Ms. Bhagwandin also noted that employees may change Working Groups after a year and that Ms. Green had been with the Compliance Working Group for more than a year.

32.     Mr. Connor was furious that Ms. Green had taken this step to distance herself from his harassing conduct.  In January 2019, at the first company business update of the year, Mr. Connor approached Ms. Green at a table where she was sitting with several co-workers and shouted at her, saying that she had no right to change Working Groups, that she had not asked him, and that she did not have permission.  Ms. Green told him that she had sought permission from Ms. Bhagwandin, who had granted it.  This incident was not only humiliating, it marked Ms. Green as someone who was seen as disfavored by the CEO, which likely had an effect upon her reputational standing within Sia. Other Sia employees who are male and under the age of 40 have changed Working Groups without repercussions.

33.     That same month, January 2019, Mr. Connor began to disparage Ms. Green to others within Sia, referring to her as a "loser" to both senior and junior employees, including project manager Jonathan Gold ("Mr. Gold").  Mr. Connor mentioned this to Ms. Green's most recent year-end reviewer as a reason she should not be promoted.  Mr. Connor's intentional efforts to harm Ms. Green's goodwill within Sia damaged her immeasurably. Upon information and belief, such conduct was not directed at male employees.

2019 WORK AND YEAR-END REVIEW

34.     In the beginning of September 2019, David Gallet ("Mr. Gallet"), an associate partner in Sia, notified Ms. Green that it would be her last day on the Société Générale project. Such an abrupt departure is an unusual occurrence, because consultants generally know with some advance notice when their project will end. In recent months, several colleagues had been taken off the project as the engagement with the client was coming to a close and Statement of Work (SOW) contracts were not renewed.  None of them were given less than a day's notice. Ms. Green's work for Société Générale was never criticized, and she believes it was viewed as competent and valuable.

35.     At the end of September 2019, Mr. Gallet called Ms. Green into his office and told her that she was taken off the Société Générale project because Mr. Gold told him that one of Société Générale employees did not like how she communicated with him.  Ms. Green told Mr. Gallet the story was not true and detailed the very minimal contact she had ever had with the client employee. She had only been on a few conference calls with the employee, where she did not speak, and she had sent him one email with documents attached.  Mr. Gallet did not investigate the matter.  Ms. Green spoke with a former colleague who was still at Société Générale.  The

11

colleague and another former colleague asked the bank employee about what had happened, and the bank employee told them that he did not know who Ms. Green was.  A few days later, Ms. Green went to Mr. Gallet's office to tell him what she had learned, *i.e.,* that the client employee did not in fact have any complaint concerning Ms. Green. Upon hearing this, Mr. Gallet became visibly angry. His face turned bright red and he told Ms. Green in a very stern and raised voice that she had no business communicating with the client.  He admitted that he did not look into this matter and had no intention of doing so.  Ms. Green felt threatened by Mr. Gallet and his demeanor.

36.      Ms. Green's skills were in high demand in 2019. In November 2019, Ms. Green was contacted by a Sia manager, Wayne Hu, about her interest on taking his place on a project at Morgan Stanley he was leaving.  Ms. Green was excited to be considered and told him that she would like to be a part of this project.  The project partner was Eric Blackman ("Mr. Blackman"). Shortly after this conversation, Ms. Green was contacted by another partner, Kavita Nar ("Ms. Nar").  She wanted Ms. Green to join her project at Morgan Stanley, which was a different project, and Ms. Green was placed there.  Although Ms. Green was slated to be at Ms. Nar's Morgan Stanley project for two months, Ms. Nar asked Mr. Connor for an extension so that more work could be completed, and it was granted. Ms. Nar was pleased with the quality and volume of Ms. Green's work during her time on the project.

37.      At the end of November 2019, Ms. Green was contacted by Mr. Gallet, who asked her for feedback on project manager Mr. Gold.  Ms. Green was on Mr. Gold's project at Société Générale.   Mr. Gallet wanted to discuss Mr. Gold's performance as project manager for his year-end review. Ms. Green was honest and disclosed several violations of both Sia's and Société Générale's codes of conduct and his creation of a hostile work environment for team female

12

members.   Reports of Mr. Gold's workplace conduct were also independently brought to Mr. Gallet by two other colleagues. Mr. Gallet appeared to be very upset by this news and brought it to human resources. When Mr. Connor was told about what Ms. Green and her colleagues said about Mr. Gold's actions, Mr. Connor went to Société Générale, where one of the reporters was working, took them out of the building, and told them never to say anything negative about Mr. Gold again.

38.     As a result of her reporting Mr. Gold's conduct – particularly the harassment of another woman – Ms. Green suffered further retaliation.  Mr. Gold was informed of Ms. Green's feedback, and he was enraged and blamed her for impacting his end-of-year appraisal. Due to Mr. Gold being Ms. Green's project manager, he was the one slated to give her 2019 appraisal. Ms. Green's 2019 year-end review included feedback from a team lead on the Scotiabank project and Mr. Gold for the Société Générale project.  Ms. Green informed Human Resources that she did not want Mr. Gold conducting her review, given all of the issues with his conduct that she had previously reported.  The two other reporters on the Société Générale project did not want him conducting their review either.  When Ms. Green's 2019 year-end appraisal was conducted, it included the fabricated story of a client having criticized her, which Ms. Green had shown was untrue.  The appraisal also said that Ms. Green missed deliverables on the Société Générale project, which was untrue.  This was retaliation for Ms. Green defending herself against Mr. Gold's falsehoods and for Ms. Green alerting Mr. Gallet to Mr. Gold's actions as the project manager. Ms. Green wrote a rebuttal that pointed out the inaccuracies of the appraisal and informed human resources, but she never received a meeting or a corrected appraisal for 2019.

2020 WORK, TAINTED REVIEW PROCESS, AND DENIAL OF PROMOTION

39.     From January 2020 to March 2021, Ms. Green worked on a second project at Scotiabank with Mr. Blackman as the project partner.  Ms. Green was billed to the bank as a Subject Matter Expert, a new designation used by Sia allowing it to bill her at a higher rate, regardless of internal title and employment status with Sia. Ms. Green was billed at $1550/day, making her one of the highest billing employees at Sia.

40.     The manager at Scotiabank was very happy with Ms. Green and her work.  On several occasions she sent an email to Mr. Blackman to let him know how pleased she was with Ms. Green's work. Mr. Blackman and Ms. Green spoke several times throughout her tenure on the project.  He had no issues with her work and was pleased with the praise she received from the Scotiabank manager.

41.     Beginning in 2020, employees were assigned a career advocate to facilitate the year-end review process.  Ms. Green worked with the career advocate assigned to her at that time, Holly Alger.  Ms. Green told Ms. Alger about what happened at the 2019 year-end review process, the Société Générale lie, and all that had transpired between Ms. Green and Mr. Connor.  Ms. Alger spoke with Mr. Blackman, Ms. Green's new manager, about how to proceed.

42.     Ms. Green worked with Ms. Alger to complete her review.  Ms. Green was given high marks on the work completed, but was given an overall low score based on her lack of participation in working groups and business development.  Ms. Green told Ms. Alger that she did not participate in working groups because of her desire to avoid further harassment at the hands of Mr. Connor – as detailed above – and that many Sia employees did not attend working groups or engage in business development, and still received good review scores.  Ms. Green learned from other colleagues that other teams were not held to the same standard and lack of working

groups/business development did not count against them.  For Ms. Green, internal Sia work was half of her review score.  For others, particularly male consultants under the age of 40, it was not even considered.  Zachary Brulinski, a man under 40, who was hired as a Consultant in Oct 2016, was promoted to Manager in Dec 2020, and he has not been seen at a working group since 2017. This disparity in the application of standards of review is because of sex, age and in retaliation for Ms. Green's opposition to discrimination.

43.      Moreover, despite Sia's assertation that Ms. Green did not attend working groups, she was asked by Mr. Gallet to join the newly formed Data Privacy working group and did so in the last quarter of 2019.  She regularly attended meetings and served as the notetaker when a team member went on leave.  She is now a member of the Capital Markets working group with Mr. Blackman serving as the practice partner.

44.      In late 2019, Ms. Alger presented Ms. Green for promotion to Supervising Senior Consultant at the managers meeting, and Ms. Green was recommended to advance to the partners' meeting.  While she had the full backing and advocacy of Mr. Blackman, Mr. Connor denied her promotion.  When Ms. Green and Mr. Blackman spoke about it, he said he would meet with Mr. Connor and ask him to overturn that decision.  In that conversation Ms. Green reminded Mr. Blackman about the praise received from the Scotiabank manager, that she was one of the highest billing employees at Sia, and that she took on extra assignments with the client.  Mr. Blackman met again with Mr. Connor, who denied the request for promotion.  Mr. Blackman was told by Mr. Connor that it was not Ms. Green's time. This denial of promotion was because of sex, age, and retaliation for opposing discrimination. As a result of the denial of promotion, Ms. Green's compensation has been depressed and her future earnings potential have been reduced.

45.     Ms. Green has been with Sia for over three and a half years and has worked on six client projects. At no time did and client, manager, or partner express any concern about the quality of her work. Given Ms. Green's positive work history, her substandard end of year grades and lack of promotion and commensurate raises and bonuses cannot be explained by work performance. Instead, they are a direct result of Mr. Connor's bias against her as a woman over 40 and retaliation against her for opposing discrimination.

46.     Until March 2021, Ms. Green was billed to clients at or above the rate as the Manager on her second Scotiabank project, yet her compensation and title are depressed as compared to her male peers and those under the age of 40.

47.     Sia has fostered a culture of harassment and inequity with respect to pay and promotions that disproportionately harms women, and older women in particular.

FUTILE REPORTING TO HUMAN RESOURCES

48.     Ms. Green has reported harassment to HR and Sia partners no less than five times, starting in early 2019, and no investigations or other actions were taken until June 2021, two months after Sia was notified of impending legal action, when it has finally launched an investigation with an outside firm.

49.     In March of 2019, Ms. Green spoke with Ms. Bhagwandin about Mr. Connor's discriminatory harassment of her, including the intense two-week period of verbal attacks and insults in July 2018 and the continued mistreatment thereafter.  Ms. Bhagwandin told Ms. Green that she was aware of other similar instances but could not do anything because no one wanted to go on record. Sia was thus on notice of this hostile and discriminatory mistreatment but failed to take corrective action to avoid future unlawful conduct.

50.     In the late Summer or early Fall of 2019, Ms. Green spoke to Ms. Bhagwandin again, this time about the pervasive culture of harassment at Sia, which Ms. Green strongly opposed.

51.     After reporting Mr. Gold's violations to Mr. Gallet at the end of 2019, the incidents were reported to HR, but none of the three reporters were contacted by HR to learn what transpired. In early 2020, Ms. Green submitted a rebuttal of her 2019 review, but it went completely unanswered. Sia has failed to provide any legitimate, non-pretextual basis for Ms. Green's low 2019 performance rating.

52.     Ms. Green's career advocate and partner were notified of her past harassment and retaliation by Mr. Connor.  No actions were taken.

53.     Ms. Green's complaints to Sia, through its available HR channel, have not resulted in corrective action or relief to her; and, upon information and belief, her allegations of wrongdoing were not investigated in good faith.

SIA'S AND MR. CONNOR'S TREATMENT TOWARDS OTHER WOMEN

54.     Mr. Connor's treatment of Ms. Green is consistent with his pattern of creating a hostile work environment for women generally, including but not limited to Brittney Witherspoon ("Ms. Witherspoon"); Rachel Miterko (nee Fair) ("Ms. Miterko"); Cynthia O'Keefe ("Ms. O'Keefe"); Inna Babenko ("Ms. Babenko"); Lauren Pickett; Ms. Bhagwandin; Gabriela Podesta ("Ms. Podesta"); Svitlana Dudchak; Lia Vydria; and Alanna Burton. He has often yelled at, intimidated, humiliated, and singled-out women without provocation or a job-related basis for his hostility. By comparison, Mr. Connor's criticism of men is objective and is usually directly related to workplace behavior or job performance. The women that Mr. Connor has bullied and/or

harassed were doing well on client projects, billable for all or most of their tenures at Sia, and/or liked and respected by their peers and colleagues.

55.     Mr. Connor became infuriated when Ms. Podesta, a woman over the age of 40, did not attend the optional North American seminar in March 2018 and when she declined to fly from her base in Houston, TX to New York to present herself to Mr. Connor and to meet colleagues in New York. Because Mr. Connor could not directly bully Ms. Podesta from afar, he pressured Noel Connolly ("Mr. Connolly") and Wayne Campbell ("Mr. Campbell") (both associate partners in Sia's Houston office during Ms. Podesta's tenure) to hassle and disparage her.  Mr. Connolly reported that Ms. Podesta was an extremely successful professional who was respected by clients, was 100% billable, and was the best revenue generator in the Houston office. Despite this, Mr. Connor instructed Mr. Connolly several times to "write up" Ms. Podesta and generally create a hostile environment because, according to Mr. Connor, Ms. Podesta's decision not to attend the seminar showed that she was not a "team player." Mr. Connolly refused to do this, but Mr. Campbell was willing to follow Mr. Connor's directive. He undermined Ms. Podesta and interfered with her relationship with the client, created conflicts over insignificant and/or non-business-related matters, and gave her a lower appraisal grade. This led to Ms. Podesta resigning from Sia. Mr. Connor also gave Ms. Podesta a lower end-of-year bonus than she merited. Mr. Connolly reported that Ms. Podesta's bonus was 3-5 times lower than men in the Houston office who were only billable 40%, far below the 100% Ms. Podesta achieved.

56.     Precious Ackah ("Ms. Ackah") was hired as an HR coordinator in Sia's New York office in November 2017. She was terminated in April 2018, two months after she reported to Ms. Bhagwandin and Mr. Connor about an employee making a comment that she found to be racially

offensive. After her report, Ms. Ackah's job title was involuntarily changed from HR coordinator to marketing coordinator, even though Sia knew that she did not have a marketing background and did not hire her for a marketing role.

57.     Kathryna Pitt ("Ms. Pitt"), a Sia employee, felt that she had been sexually harassed in September 2018 by two male contractors Sia hired for a project at Scotia. Mr. Becquet (Ms. Pitt's project manager) was aware of this and failed to take corrective action, other than to move Ms. Pitt to a new office. This is typical of Sia's failure to address credible allegations of harassment by women.

58.     Mr. Connor created a hostile work environment for Ms. Miterko and Ms. Bhagwandin after they returned to work from maternity leave. Ms. Miterko had her baby on October 9, 2018 and returned to work in 2019; and Ms. Bhagwandin had her baby in November 2019 and returned to work around March 2020. Mr. Connor made offensive, unwelcome, and false comments about their recent childbirths and their purported poor work performance or lack of availability subsequent to becoming parents. Ms. Miterko and Ms. Bhagwandin resigned in June 2020 and September 2020, respectively.

59.     In or around February 3, 2020, Mr. Connor flew into a rage and began screaming at and berating Ms. Babenko loudly enough for others in the office to hear. Shortly after Mr. Connor's verbal attack, Ms. Babenko needed to go to the emergency room and required several days away from work to recover.

60.     Naika Daudin ("Ms. Daudin"), a Sia employee, resigned from Sia in 2020 after having reported to Brittney Witherspoon, a fellow Sia employee, in late 2019 that she was experiencing difficulties with Mr. Connor.

19

61.     Mr. Connor expressed dislike for the way Janelle Jagnanan (Ms. Jagnanan") (a former senior consultant in the energy practice at Sia's Houston office) dressed and because he did not think she looked attractive. Mr. Connor said he wished he could put Ms. Jagnanan's brain inside the body of Hessed Honstein, a former model and a woman who Mr. Connor finds physically attractive, who is currently in an administrative role (talent acquisition) at Sia's Houston office.

62.     Upon information and belief, Ms. Bhagwandin has admitted, as early as mid-2018, that she was aware of the hostile work environment Mr. Connor created but that she felt powerless to stop him.

WOMEN UNDERREPRESENTED AT THE SENIOR LEVEL

63.     Prior to December 2020, no woman at Sia had been promoted to a senior-level position of senior manager, managing director, associate partner, or partner, even though there are women with measurable key performance indicators ("KPIs") to merit a promotion to a senior-level position. When considering promoting someone to associate partner or partner, KPIs around business generating are the primary consideration. Partners have said during business update calls (including as recently as September 2020) that, to be promoted to partner, a person needs to have "a book of business." Even though there are women who have satisfied these objective criteria, they have not been promoted. This reflects Mr. Connor's deeply entrenched bias against women.

64.     Ms. Pickett, for example, is a woman over the age of 40 who has originated more business (and/or has been an integral part of closing deals) than all or virtually all of the male partners (excluding those from the acquisitions). She has decades of relevant work experience, has many contacts within the financial services industry, is Sia's anti-money laundering (AML) subject matter expert, has extensive internal involvement with Sia's compliance working group, and has

worked for Sia U.S. since 2013. Despite this, Ms. Pickett still has not been promoted to associate partner, managing only to rise to the level of managing director in December 2020. By comparison, Mr. Pearson was promoted to associate partner in December 2018, even though his originations were inferior to Ms. Pickett's, and he suffered from bad reviews due to business conduct and poor treatment of personnel. He has subsequently left Sia.

65.     Male employees are not subject to the harassment and mistreatment that Mr. Connor directs at women.

PROLONGED FAILURE TO CORRECT KNOWN UNLAWFUL CONDUCT

66.     Mr. Courtecuisse has known for years about reports of unethical behavior and discriminatory harassment by Mr. Connor. Shortly after Mr. Connor verbally attacked an employee from Sia Partners' Montreal office during the North American seminar in May 2017, Mr. Courtecuisse demoted him from CEO of Sia North America (which comprised the U.S. and Canada) to CEO of Sia U.S.  Upon information and belief, Mr. Courtecuisse has seen numerous online reviews (for example, Glassdoor and Vault) from previous and current employees, spanning from 2014 – 2021, which express concerns about Mr. Connor's hostility, bias against women, racial bias, and reports of pay discrimination against employees requiring a work visa. Since 2018, Sia and Sia Partners has more than once asked employees to complete surveys and questionnaires about their experiences at Sia. In addition, upon information and belief, employees have directly told Mr. Courtecuisse about the hostile work environment Mr. Connor has created in the U.S.  (for example, King Bouloud, a former manager from Sia Partners' Paris office, who discussed concerns after spending time in Sia's New York office).  Mr. Courtecuisse has ignored these concerns and focused instead on Sia's U.S. revenue. Meeting revenue targets does not exempt Mr. Connor from

the law or Sia's policies regarding harassment and investigations.

67.     Sia and Mr. Courtecuisse failed to properly investigate claims against Mr. Connor or implement controls to protect Ms. Green and others from further harm from Mr. Connor. Sia and Mr. Courtecuisse have taken no material disciplinary action against Mr. Connor for violating Sia's U.S. anti-harassment policy, including using his power as CEO to interfere with a fair and timely investigation of the claims against him.

68.     Mr. Connor's consistent harassment and discrimination against women, and his violations of Sia policy without consequence, sends a message that such conduct is tolerated at Sia.  Until Sia and Mr. Courtecuisse hold Mr. Connor accountable for his actions against Ms. Green and other women, it can only be concluded that Sia's diversity initiatives are not calculated to change its toxic work environment.  Instead, these initiatives are a sham intended to protect Sia's image and conceal and deflect from legitimate concerns about harassment and discrimination.

## DAMAGES

69.     As a result of Defendants' unlawful conduct, Ms. Green has suffered extensive economic and non-economic damages. Ms. Green has been damaged financially, in the form of lost earnings and lost future earnings potential; reputationally, as a result of Mr. Connor's campaign of false criticisms against her; and emotionally, as a consequence of being attacked, derided and harassed in the workplace because of her sex and age and in retaliation for opposing discrimination.

70.     During Ms. Green's time at Sia, her promotional opportunities have been blocked, her pay has been materially lower than that of male and younger peers performing substantially

equivalent work under similar working conditions, and she has been the object of ongoing hostility and harassment in the workplace. This discriminatory and retaliatory conduct cannot be justified by business necessity, and the justifications offered for these actions are plainly pretextual.

## AS AND FOR A FIRST CAUSE OF ACTION

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, against Sia and Sia Partners**

71.     Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 70 above, as if fully set forth herein.

72.     The actions of Defendants in failing to properly pay and promote Plaintiff because of her sex and age while providing superior compensation and titles to similarly-situated males and people under age 40, in subjecting her to discriminatory harassment, and in taking adverse action against Plaintiff because of her opposition to practices made unlawful by Title VII, constitute discrimination based on sex and age, and constitute retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.*

## AS AND FOR A SECOND CAUSE OF ACTION

**Violation of the New York State Human Rights Law, New York Executive Law §§290, 296, against Sia, Sia Partners, and Daniel Connor**

73.     Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 72 above, as if fully set forth herein.

74.     The actions of the Defendants in failing to properly pay and promote Plaintiff because of her sex and age while providing superior compensation and titles to similarly-situated males and people under age 40, in subjecting her to discriminatory harassment, and in taking adverse action against Plaintiff because of her opposition to practices made unlawful by the

23

NYSHRL, constitute discrimination based on race and sex, and constitute retaliation, in violation of New York Executive Law §§290 and 296.

## AS AND FOR A THIRD CAUSE OF ACTION

### Violation of the New York State Human Rights Law, New York Executive Law §§290, 296(6), against Daniel Connor

75.     Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 74 above, as if fully set forth herein.

76.     The actions of Defendant Mr. Connor to deny equal compensation and titles to Plaintiff and to subject her to unlawful and discriminatory harassment constitute aiding and abetting discrimination on the basis of race and sex in violation of New York Executive Law §§290 and 296(6).

## AS AND FOR A FOURTH CAUSE OF ACTION

### Violation of the New York City Human Rights Law, Admin. Code §8-101, *et seq.*, against Sia, Sia Partners and Daniel Connor

77.     Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 76 above, as if fully set forth herein.

78.     The actions of Defendants in failing to properly pay and promote Plaintiff because of her sex and age while providing superior compensation and titles to similarly-situated males and people under age 40, in subjecting her to discriminatory harassment, and in taking adverse action against Plaintiff because of her opposition to practices made unlawful by NYCHRL, constitute discrimination based on race and sex, and constitute retaliation, in violation of the New York City Administrative Code §8-101, *et seq.*

24

## AS AND FOR A FIFTH CAUSE OF ACTION

**Violation of the New York City Human Rights Law, Admin. Code §8-107(6),
against Daniel Connor**

79.     Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 78 above, as if fully set forth herein.

80.     The actions of Defendant Mr. Connor to deny equal compensation and titles to Plaintiff and to subject her to unlawful and discriminatory harassment constitute aiding and abetting discrimination on the basis of race and sex in violation of New York City Administrative Code §8-107(6).

## AS AND FOR A SIXTH CAUSE OF ACTION

**Violation of the Equal Pay Act, 29 U.S.C. §206(d),
against Sia and Sia Partners**

81.     Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 80 above, as if fully set forth herein.

82.     The actions of Defendants to compensate male employees at a higher rate than Plaintiff, when they perform substantially equal work as the Plaintiff under substantially similar conditions constitute unequal pay based on sex in violation of the Equal Pay Act, 29 U.S.C. §206(d).

## AS AND FOR A SEVENTH CAUSE OF ACTION

**Violation of New York Labor Law § 194, *et seq*.
against Sia and Sia Partners**

83.     Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 82 above, as if fully set forth herein.

84.     The actions of Defendants to compensate male employees at a higher rate than Plaintiff, when they perform substantially equal work as the Plaintiff under substantially similar conditions constitute unequal pay based on sex in violation of New York Labor Law § 194, *et seq.*

## AS AND FOR AN EIGHTH CAUSE OF ACTION

**Violation of the Age Discrimination in Employment Act, 29 U.S.C. §621, *et seq.*
against Sia and Sia Partners**

85.     Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 84 above, as if fully set forth herein.

86.     The actions of Defendants in failing to properly pay and promote Plaintiff because of her age while providing superior compensation and titles to similarly-situated people under age 40, constitute age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §621, *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court will:

A.     Issue a declaration that Defendants violated Plaintiff's rights under federal, state and local law;

B.     Grant injunctive relief in the form of retroactive promotion, fair appraisals and a non-discriminatory appraisal process for each year since 2018;

C.     Award equitable relief in the form of back pay;

D.     Award liquated damages of 100% of unpaid wages, as provided for in the Equal Pay Act, 29 U.S.C. §216(b) and/or 300% of unpaid wages, as provided for by New York Labor Law §198.

E.      Award compensatory damages for the injuries Plaintiff suffered by reason of Defendants' unlawful conduct, including damages for the pain, suffering, emotional distress, loss of dignity, humiliation, and damage to reputation and livelihood endured by Plaintiff in amounts that are fair, just and reasonable, to be determined at trial;

F.      Award Plaintiff punitive damages in an amount to be determined at trial;

G.      Award Plaintiff all reasonable attorneys' fees and costs of this action and fees for any work required to ensure compliance with any order of injunctive relief, as provided for in 42 U.S.C. §1981a, 42 U.S.C. §1988, 42 U.S.C. §2000e-5(g) & (k), 29 U.S.C. §216(b), 29 U.S.C. §626(b), and State and Local law; and

H.      Grant such other and further relief as the Court determines to be just and proper.

Dated: June 29, 2021
       New York, New York

                                                LEVY RATNER, P.C.

                                                _____
                                     By:        Dana E. Lossia
                                                80 Eighth Avenue
                                                New York, New York 10011
                                                (212) 627-8100
                                                (212) 627-8182 (fax)
                                                dlossia@levyratner.com

                                                *Attorneys for Jennifer Green*

27